UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SAM WYLY and RANGER GOVERNANCE, LTD.,

                             Plaintiffs,                  REPORT AND
                                              RECOMMENDATION

          -against-                             CV 05-4430 (TCP)(ETB)

CA, INC. and STERLING SOFTWARE, INC.,

                            Defendants.
------------------------------------------------------------------------X

TO THE HONORABLE THOMAS C. PLATT, UNITED STATES DISTRICT JUDGE:

      Before the court is the motion of the defendants, CA, Inc. ("CA") and Sterling Software,

Inc. ("Sterling") (collectively "defendants"), for summary judgment, pursuant to Federal Rule of

Civil Procedure 56. Plaintiffs, Sam Wyly ("Wyly") and Ranger Governance, Ltd. ("Ranger")

(collectively "plaintiffs") oppose the defendants' motion, asserting that there are genuine issues

of fact that necessitate a trial. For the following reasons, I recommend that defendants' motion

be granted and that this action be dismissed in its entirety.[1]

---

[1] After the within motion was fully briefed, plaintiffs filed what amounts to a surreply,
requesting that the Court strike defendants' cover letter accompanying the fully briefed motion
on the grounds that certain assertions contained in it are "improper." (Pl. Letter Mot. dated Jan.
13, 2009 at 1.) By the same letter motion, plaintiffs also challenge what they consider
"gratuitous ad hominem attacks" contained in defendants' reply brief. (Id. at 2.) Defendants
responded by letter dated January 14, 2009, stating that plaintiff's "impermissible surreply"
should be stricken. (Def. Letter dated January 14, 2009.) As plaintiffs' counsel is aware, sur-
replies are generally not permitted, particularly where, as here, prior permission to submit the
surreply was not obtained. Accordingly, plaintiffs' January 13, 2009 surreply is stricken and
was not considered in rendering this Report and Recommendation.
      The Court similarly has not considered the assertions made in defendants' cover letter or
what plaintiffs' characterize as ad hominem attacks made in the defendants' reply brief.

<u>FACTS</u>

In 1981, Wyly co-founded Sterling Software, Inc., serving as a senior executive and

Chairman of its Board of Directors until March 2000, when Sterling was acquired by CA.  (Pl. R.

56.1 Statement ("Pl. 56.1") ¶¶ 33-34; Def. R. 56.1 Statement ("Def. 56.1" ¶ 2.)  Prior to CA's

acquisition, Wyly and Sterling entered into a Change in Control Severance Agreement, dated

November 15, 1999 (the "1999 Agreement").  (Pl. 56.1 ¶ 35.)  Paragraph Seven of the 1999

Agreement provides as follows:

> It is the intent of [Sterling] that [Wyly] not be required to incur legal
> fees and the related expenses associated with the interpretation,
> enforcement or defense of [Wyly's] rights under this Agreement by
> litigation or otherwise because the cost and expense thereof would
> substantially detract from the benefits intended to be extended to
> [Wyly] hereunder.  Accordingly, if it should appear to [Wyly] that
> [Sterling] has failed to comply with any of its obligations under this
> Agreement or in the event that [Sterling] or any other person takes or
> threatens to take any action to declare this Agreement void or
> unenforceable, or institutes any litigation or other action or
> proceeding designed to deny, or to recover from, [Wyly] the benefits
> provided or intended to be provided to [Wyly] hereunder, [Sterling]
> irrevocably authorizes [Wyly] from time to time to retain counsel of
> [Wyly's] choice, at the expense of [Sterling] as hereafter provided,
> to advise and represent [Wyly] in connection with any such
> interpretation, enforcement or defense, including without limitation
> the initiation or defense of any litigation or other legal action,
> whether by or against [Sterling] or any Director, officer, stockholder
> or other person affiliated with [Sterling], in any jurisdiction . . .
> Without respect to whether [Wyly] prevails, in whole or in part, in
> connection with any of the foregoing, [Sterling] will pay and be
> solely financially responsible for any and all attorneys' and related
> fees and expenses incurred by [Wyly] in connection with any of the
> foregoing.

(Giuffra Decl., Ex. B.)

As part of CA's acquisition of Sterling, on February 14, 2000, Wyly, Sterling and CA

amended the 1999 Agreement to include a non-compete provision and to make CA a party to the

1999 Agreement (the "2000 Amendment"). (Pl. 56.1 ¶ 39.) The 2000 Amendment provided that "[e]xcept as amended hereby, all other provisions of the [1999] Agreement shall remain in full force and effect." (Giuffra Decl., Ex. C.) The acquisition became effective on March 31, 2000, at which point Sterling became a wholly-owned subsidiary of CA and CA succeeded to all of Sterling's obligations under the 1999 Agreement, including the provision pertaining to attorney's fees. (Pl. 56.1 ¶ 40.)

In June 2001, Wyly formed Ranger Governance, Ltd. (Def. 56.1 ¶ 3.) Thereafter, Ranger purchased 100 shares of CA stock for the sole purpose of conducting a proxy contest. (Def. 56.1 ¶ 4.) Through its proxy contest, Ranger sought to replace the entire CA Board of Directors with Wyly, Ranger's President, Stephen Perkins ("Perkins"), and eight other individuals. (Def. 56.1 ¶ 5.) Walter Haefner ("Haefner"), CA's largest shareholder at the time, did not support Ranger's proposed slate of directors. (Def. 56.1 ¶ 6.) Ranger subsequently lost the 2001 proxy contest. (Def. 56.1 ¶ 8.)

In February 2002, the United States Securities and Exchange Commission and the United States Attorney's Office for the Eastern District of New York undertook a joint investigation of CA's accounting practices. (Pl. 56.1 ¶ 41.) On February 20, 2002, CA issued a press release in response to a newspaper article concerning the investigation, stating "[t]he reporting of our financial results has always been in accordance with applicable accounting principles." (McGrath Decl., Ex. 38.) By letter dated April 11, 2002, eight independent CA directors responded to a letter sent by Ranger's President, Perkins, in which Perkins raised concerns about CA's business performance. (McGrath Decl., Ex. 6.) In their letter, the eight directors stated that Ranger's "attacks on CA's accounting practices are unjustified" and that they had "reviewed

CA's accounting practices and have satisfied [them]selves - as has KPMG, the company's auditors - that CA's accounting is appropriate and transparent." (McGrath Decl., Ex. 6.)

Despite the April 11, 2002 letter from CA's independent directors, Wyly remained "deeply concerned" about the leadership of CA and the sufficiency of the disclosures being made to CA shareholders. (Wyly Decl., dated July 20, 2005 ("First Wyly Decl.") ¶ 11, annexed to Giuffra Decl. as Ex. A.) Thereafter, in June 2002, Ranger launched a second proxy contest, again seeking to obtain seats on CA's Board of Directors. (Def. 56.1 ¶ 9.) CA's largest shareholder, Haefner, again refused to support Ranger's proxy contest. (Def. 56.1 ¶ 11.) Wyly, Ranger and CA thereafter entered into settlement negotiations in an effort to end the proxy contest. (Def. 56.1 ¶ 12.)

On July 24, 2002, CA, Wyly and Ranger entered into two separate settlement agreements (the "Settlement Agreements") for the discontinuance of Ranger's proxy contest. (Giuffra Decl, Exs., M, N.) The first, between Wyly and CA (the "Wyly Agreement"), is a second amendment to the 1999 Agreement whereby Wyly agreed to cause Ranger to cease its proxy contest, to withdraw its slate of nominees to CA's Board of Directors and to refrain from interfering in CA's business operations for a period of five years. (Giuffra Decl., Ex. M.) In return, CA agreed to pay Wyly $10 million. (Giuffra Decl., Ex. M.)

In the second agreement, between Ranger and CA (the "Ranger Agreement"), Ranger agreed to terminate its proxy contest, withdraw its slate of nominees to CA's Board of Directors and to refrain from interfering in CA's business operations for a period of five years. (Giuffra Decl., Ex. N.) In return, CA agreed "to elect to its board of directors after [CA's] 2002 Annual Meeting of Stockholders one independent director not currently a member of its board of

directors . . . to serve until the earlier of the next annual meeting of [CA's] stockholders or the resignation or removal of such director." (Giuffra Decl., Ex. N.) Under the Ranger Agreement, the parties also agreed "to issue a joint press release in the form attached as Exhibit A" and to "make all statements relating to matters set forth in [the Ranger Agreement] in a manner that is not inconsistent in any significant manner with the statements in the joint press release." (Giuffra Decl., Ex. N.) The Settlement Agreements do not contain any representations concerning CA's accounting practices. (Def. 56.1 ¶ 27.)

On July 24, 2002, Ranger discontinued its proxy contest. (Def. 56.1 ¶ 28.) That same day, CA paid Wyly the $10 million promised under the Wyly Agreement. (Def. 56.1 ¶ 29.)

In October 2002, William Stavropoulos ("Stavropoulos"), the Chairman of the Board of Directors of Dow Chemical Company, was elected to CA's Board of Directors to serve as an additional independent director, as required by the Ranger Agreement. (Giuffra Decl., Ex. P.) Stavropoulos resigned from CA's Board of Directors in February 2003. (Giuffra Decl., Ex. R.)

The Government investigation into CA yielded evidence of a substantial accounting fraud, which resulted in numerous CA executives being charged with, and pleading guilty to, participation in a conspiracy to artificially inflate corporate revenues and earnings in order to increase CA's stock price. (McGrath Decl., Exs. 9-14.) In April 2004, CA restated its financial statements for the previous fiscal years ending March 31, 2000 and 2001. (McGrath Decl., Ex. 19.)

Upon learning of CA's restatement of its financial statements, Wyly initiated his own investigation and informed CA's Chairman of the Board, Lewis Ranieri ("Ranieri"), that he would like to arrange a meeting with the Board of Directors to discuss certain ideas that Wyly

had for CA.  (McGrath Decl., Ex. 2.)  Ranieri responded to Wyly's request by letter dated May 6, 2004, reminding Wyly of the 2002 Settlement Agreement in which Wyly agreed not to interfere with CA's business operations for a period of five years, unless specifically invited to do so by the Board of Directors.  (McGrath Decl., Ex. 2.)  Ranieri informed Wyly that the Board of Directors was "not willing to invite [him] to be involved with [CA] or [its] shareholders." (McGrath Decl., Ex. 2.)  Ranieri further advised Wyly that CA "expect[ed] [him] to live up to [his] agreement."  (McGrath Decl., Ex. 2.)

Undeterred by Raneiri's letter, on June 7, 2004, counsel for Ranger wrote to CA's acting CEO at the time, Kenneth Cron, informing him of Ranger's investigation into "the legal rights belonging to CA with respect to the recovery of compensation paid to certain current executives and to certain former executives."  (McGrath Decl., Ex. 20.)  Counsel for Ranger stated that it was writing "to seek [CA's] assistance, input and guidance in connection with the investigation." (McGrath Decl., Ex. 20.)  After receiving no response to its letter, Ranger commenced a derivative action in this court against CA and certain of its present and former officers and directors on June 29, 2004, Computer Associates International, Inc. Derivative Litigation, CV 04-2697 (the "Derivative Action").  (McGrath Decl., Ex. 22.)

By letter dated June 30, 2004, counsel for CA responded to Ranger's letter dated June 7, 2004, advising Ranger that "[i]n connection with the government investigation, CA's Board of Directors [was] continuing to review the matter of compensation paid or due to individuals subject to the investigation, and possibly other persons."  (McGrath Decl., Ex. 3.)  Counsel for CA further advised that once CA's review was competed, "the Board [would] take such action as it deem[ed] in the best interests of CA and its shareholders" and requested that Ranger submit

any information it may have relevant to the Board's review.  (McGrath Decl., Ex. 3.)  The June

30, 2004 letter concluded as follows:

> Finally, we view your letter of June 7, which was released to the press, and the institution by Ranger Governance, Ltd. ("Ranger") of a purported shareholder derivative action against CA and certain present and former CA executives, also reported to the press, as a breach of Ranger's obligations under the Agreement between CA and Ranger, dated July 24, 2002, and Sam Wyly's obligations under the Second Amendment to the Change in Control Severance Agreement, dated July 24, 2002.  CA expects Ranger and Mr. Wyly to honor their contractual obligations.

(McGrath Decl., Ex. 3.)

Counsel for Ranger responded by letter dated July 6, 2004, stating that it disagreed with

CA's "suggestion" that Ranger and Wyly's conduct constituted a breach of the Settlement

Agreements.  (McGrath Decl., Ex. 23.)  According to Ranger's counsel, the Settlement

Agreements were "simply an agreement not to wage a proxy fight for a certain period of time

and . . . an agreement not to compete with CA for a certain period of time."  (McGrath Decl., Ex.

23.)  Ranger's counsel stated that since neither Ranger or Wyly "is waging a proxy fight or

competing with CA," it "would be interested in [CA's] explanation as to exactly how . . .

[Ranger's] actions violate the agreements."  (McGrath Decl., Ex. 23.)  Neither CA nor its

counsel responded to the July 6, 2004 letter.

On August 9, 2004, plaintiffs commenced an action against defendants in Texas state

court, alleging breach of the Settlement Agreements and seeking declaratory relief as well as

attorney's fees.  That action was subsequently removed to the United States District Court for the

Northern District of Texas.  Thereafter, on February 18, 2005, plaintiffs commenced a second

action against defendants, this time in federal court in Texas, alleging that defendants breached

the Wyly Agreement by refusing to pay Wyly's legal fees.  The two actions were subsequently consolidated.

Plaintiffs thereafter amended their Complaint on March 31, 2005 to include a claim that defendants fraudulently induced them into entering into the Settlement Agreements. Accordingly, the Amended Complaint alleges two causes of action - breach of contract and fraudulent inducement - and seeks damages, rescission of the Settlement Agreements, restitution, declaratory relief and attorney's fees.[2]  On September 7, 2005, plaintiffs' action was transferred to this court due to the presence here of the previously filed shareholder Derivative Action.

In February 2005, Wyly requested that CA assume financial responsibility for his legal fees incurred in connection with the within action.  (McGrath Decl., Ex. 26.)  By letter dated February 16, 2005, counsel for CA responded that it "does not believe that it is obligated to pay Mr. Wyly's legal fees in connection with [this] litigation."  (McGrath Decl., Ex. 26.)

<u>D</u>ISCUSSION

I.    <u>Legal Standard</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The burden is on the moving party to establish the lack of any factual issues.  See <u>Celotex Corp. v.</u>

---

[2]  In their memorandum of law in opposition to the within motion, plaintiffs inform the Court that they are withdrawing the requests contained in the Amended Complaint for actual damages, compensatory damages, consequential damages, exemplary damages, rescission of the Settlement Agreements, and restitution.  (Pl. Mem. of Law 11 n.51.)

Catrett, 477 U.S. 317, 323 (1986).  The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Rather, the requirement is that there be no "genuine issue of material fact."  Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).  When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts."  Id. at 586.  Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial."  Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted).  "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim."  Meltzer, 440 F. Supp. 2d at 187.

Summary judgment should not be regarded as a procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure, which are designed to "secure the just,

speedy and inexpensive determination of every action." <u>Celotex</u>, 477 U.S. at 327. Rule 56 must

be "construed with due regard not only for the rights of persons asserting claims and defenses

that are adequately based in fact to have those claims and defenses tried to a jury," but also for

the rights of those persons "opposing such claims and defenses to demonstrate, . . . prior to trial,

that the claims and defenses have no factual basis." <u>Id.</u> By its terms, Rule 56 does not require

that a trial judge make any findings of fact. <u>See</u> <u>Anderson</u>, 477 U.S. at 250. The only inquiry to

be performed is the determination of whether there is a need for trial. <u>See id.</u> The court's

principal analysis on a motion for summary judgment is to ascertain whether there are any

"genuine factual issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party." <u>Id.</u>


II.    <u>Breach of Contract</u>

Pursuant to New York law, "an action for breach of contract requires proof of (1) a

contract; (2) performance of the contract by one party; (3) breach by the other party; and (4)

damages." <u>Gutt v. Nassau Health Care Corp.</u>, No. 04CV57, 2005 U.S. Dist. LEXIS 38775, at

*15 (E.D.N.Y. Mar. 15, 2005) (<u>quoting</u> <u>First Investors Corp. v. Liberty Mut. Ins. Co.</u>, 152 F.3d

162, 168 (2d Cir. 1998)). The issue here is whether CA breached the Settlement Agreements

entered into with plaintiffs on July 24, 2002.

Under the terms of the Wyly Agreement, Wyly agreed to cause Ranger to terminate its

proxy contest in exchange for $10 million. (Giuffra Decl., Ex. M.) Under the terms of the

Ranger Agreement, Ranger agreed to cease its proxy contest in exchange for CA's promise to

elect an additional independent director to its Board of Directors. (Giuffra Decl., Ex. N.) The

evidence submitted with respect to the within motion unequivocally establishes that CA fulfilled its obligations under both Settlement Agreements.

First, CA paid Wyly the $10 million promised under the Wyly Agreement on July 24, 2002, the same day that Ranger discontinued its proxy contest. Plaintiffs do not dispute this in any way. Second, in October 2002, CA elected Stavropoulos to its Board of Directors, as required under the terms of the Ranger Agreement. Stavropoulous served in that capacity until February 2003, when he voluntarily resigned. This, too, is undisputed.

A.     The Promise to Elect an Additional Independent Director

Plaintiffs now claim that CA breached its obligations under the Ranger Agreement by "failing to elect a truly independent director in the time and manner promised . . . ." (Am Compl. ¶ 69.) According to plaintiffs, "a question of fact exists as to when Stavropoulous stopped 'serving' as a CA director - assuming he ever served in such a capacity." (Pl. Mem. Law Opp'n 15.) Plaintiffs assert that Stavropoulos only attended three CA Board of Directors meetings: (1) the meeting of October 22, 2002 to announce his election to the Board; (2) a special meeting on November 15, 2002, during which Charles Wang announced his retirement; and (3) the meeting of January 21, 2003, which Stavropolous attended telephonically, announced his resignation from the Board, and then signed off from the meeting. (McGrath Decl., Exs. 27, 29-30.) Plaintiffs contend that, as a result, "Stavropoulous did not truly serve as a CA director," thereby breaching CA's obligations under the Ranger Agreement. (Pl. Mem. Law Opp'n 15-16.) Plaintiffs further assert that CA breached the "spirit" of the Ranger Agreement because Stavropolous did not serve as a CA director for "a period of years" or on a "permanent" basis. (Giuffra Decl., Ex. D at 174, Ex. E at 120, Ex. L at 163.)

Paragraph four of the Ranger Agreement pertains to CA's obligation to elect an additional independent director and states as follows:

> [CA] agrees to elect to its board of directors after [CA's] 2002 Annual Meeting of Stockholders one independent director not currently a member of its board of directors, nominated by [CA's] Continuing Directors, to serve until the earlier of the next annual meeting of the [CA's] stockholders or the resignation or removal of such director.

(Giuffra Decl., Ex. N at ¶ 4.)  By its very terms, the Ranger Agreement did not prescribe that the independent director needed to serve for a period of years or permanently.  Nor did the Agreement specify a minimum number of meetings that the director needed to attend.  Rather, it merely stated that the newly elected independent director would serve "until the earlier of the next annual meeting . . . or the resignation or removal of [the] director."  (Id.)  "A court may not rewrite into a contract conditions the parties did not insert . . . ."  Marine Assoc., Inc. v. New Suffolk Dev't Corp., 510 N.Y.S.2d 175, 178 (2d Dep't 1986) (citing cases).  Stavropolous was elected to CA's Board of Directors in October 2002 and served until his resignation, which he tendered to the Board on January 21, 2003 and publicly announced in February 2003.  Such service satisfies CA's contractual obligation under the Ranger Agreement.[3]

Plaintiffs further argue that "[a] serious question . . . exists whether CA had already decided to bring Stavropoulos onto the Board prior to promising Plaintiffs that a new independent director would be added - thus calling into question the consideration (or lack thereof) for Plaintiffs' commitments."  (Pl. Mem. Law Opp'n 17.)  To support this claim,

---

[3]  Plaintiffs' own witness, Ranger President Stephen Perkins, agreed at his deposition that based on the wording of paragraph 4 of the Ranger Agreement, CA complied with its obligation to elect an additional independent director.  (Giuffra Decl., Ex. L at 164-65.)

plaintiffs point to the meeting minutes from the May 14, 2002 CA Board of Directors meeting, during which Sanjay Kumar ("Kumar"), then Chief Executive Officer of CA, "reported to the Directors the status of discussions with . . . Stavropoulos concerning his possible addition to the Board." (McGrath Decl., Ex. 34.) Plaintiffs assert that this evidence establishes that "Kumar had previously selected Stavropoulos to join CA's Board," in which case CA's promise to appoint an additional independent director could not serve as consideration for plaintiffs' promise to discontinue its proxy contest. (Pl. Mem. Law Opp'n 17.)

However, plaintiffs appear to overlook the next sentence in the May 14, 2002 meeting minutes wherein the directors "also discussed other possible candidates with whom preliminary conversations had taken place." (McGrath Decl., Ex. 34.) While CA may have been considering adding Stavropoulos to its Board of Directors in May 2002 - approximately two months before it entered into the Settlement Agreements with plaintiffs - the evidence equally establishes that the Board was considering several other candidates at that time. Moreover, there has been nothing offered to suggest that CA had already decided to elect Stavropoulos to its Board of Directors as early as May 2002. Rather, the meeting minutes specifically state that the discussions with Stavropoulos concerned his "possible" addition to the Board. (Id.) Accordingly, since CA was not under any "preexisting legal duty" to appoint Stavropoulos to its Board of Directors, CA's promise to elect an additional independent director was "adequate consideration" for plaintiffs' agreement to terminate its proxy fight. Fafoutis v. Lyons, 540 N.Y.S.2d 20, 21 (2d Dep't 1989) ("A promise to comply with a preexisting legal duty is not adequate consideration upon which a valid contract may be based.").

B.    Plaintiffs' Claim that CA Promised to Adhere to a "Gold Standard"

Plaintiffs further allege that CA breached the Settlement Agreements by "fail[ing] to become a 'gold standard' of corporate governance with transparency in accounting and financial reporting as promised . . . ." (Am. Compl. ¶ 69.)  However, nowhere in either of the Settlement Agreements is there any mention of such a promise on the part of CA.  Nor is the term "gold standard" found in either Settlement Agreement, which plaintiffs' own witness, Perkins, confirmed at his deposition.  (Giuffra Decl., Ex. L at 120-23.)  In response to questioning from defendants' counsel, and stating the obvious, Perkins agreed that the term "gold standard" does not appear anywhere in the Settlement Agreements.  (Giuffra Decl., Ex. L at120-21.)  Perkins further agreed that the Settlement Agreements do not contain any "promise regarding accounting improprieties." (Id. at 121-22.)  Nor do they contain any "promise or . . . representation regarding more transparency in accounting." (Id. at 122.)

Plaintiffs attempt to salvage their claim by asserting that the joint press release issued by CA and Ranger on July 24, 2002, announcing the discontinuance of Ranger's proxy contest, provides evidence that the Settlement Agreements obligated CA to adopt a "gold standard" of corporate governance.  The statement in the press release on which plaintiffs rely, however, is actually one by Wyly, not CA, and provides as follows:

> With the changes that CA has made, and under the leadership of Sanjay Kumar and his management team, I am confident that CA is on a course to being recognized as the gold standard in good corporate governance.  CA's new business model and demonstrable focus on corporate governance should yield good results for all shareholders in the future.  I am proud of Ranger's role in this process of shareholder democracy.

(Giuffra Decl., Ex. O.)  No other statements in the joint press release refer to a "gold standard"

of corporate governance.  Nor are there any statements made by CA in the press release with respect to a "gold standard" of corporate governance.

Under New York law, "[t]here is a presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties," particularly when "the instrument is between sophisticated, counseled businessmen."  Quantum Chem. Corp. v. Reliance Group, Inc., 580 N.Y.S.2d 275, 276 (1st Dep't 1992) (citations omitted).  When interpreting contracts, New York courts adhere to the "familiar and eminently sensible proposition of law [] that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms."  Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475 (2004) (quoting W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)) (additional citation omitted) (alteration in original).  "[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  Vermont Teddy Bear, 1 N.Y.3d at 475 (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 72 (1978)).

"[T]he best evidence of what the parties to a written agreement intend is what they say in their writing."  Henrich v. Phazar Antenna Corp., 827 N.Y.S.2d 58, 60 (2d Dep't 2006) (quoting Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (2002)).  "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Henrich, 827 N.Y.S.2d at 60 (quoting Greenfield, 98 N.Y.2d at 569); see also Vermont Teddy Bear, 1 N.Y.2d at 475 ("In the absence of any ambiguity, we look solely to the language used by the parties' to discern the contract's meaning.").  Courts are not permitted to "add or excise terms" to a contract, nor are they permitted to "distort the meaning of those used,"

thereby creating a new contract than that originally intended by the parties "under the guise of interpreting the writing." Vermont Teddy Bear, 1 N.Y.2d at 475 (citation omitted).

Whether a contract is ambiguous is a question of law for the court to decide. See South Rd. Assoc. v. IBM Corp., 4 N.Y.3d 272, 278 (2005) (citing Greenfield, 98 N.Y.2d at 569); Schmidt v. Magnetic Head Corp., 468 N.Y.S.2d 649, 653 (2d Dep't 1983) ("The threshold question of whether a writing is ambiguous is the exclusive province of the court."). Where a contract is unambiguous, extrinsic or parol evidence is inadmissible. See Namad v. Salomon Inc., 74 N.Y.2d 751, 753 (1989) ("Parol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties."); Henrich, 827 N.Y.S.2d at 60 ("Extrinsic or parol evidence of the parties' intent may be considered only if the agreement is ambiguous."). Moreover, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." South Rd. Assoc., 4 N.Y.3d at 278 (quoting W.W.W. Assoc., 77 N.Y.2d at 163). In addition, "silence alone does not equate to ambiguity." Henrich, 827 N.Y.S.2d at 61 (citing Greenfield, 98 N.Y.2d at 573).

Here, the Settlement Agreements are complete, clear and unambiguous. In return for plaintiffs' agreement to discontinue the proxy contest, CA promised to pay Wyly $10 million and to elect an additional independent director to its Board of Directors. The provisions of the Settlement Agreements are straightforward and precise and reasonably susceptible of only one interpretation. Accordingly, extrinsic evidence, such as the joint press release, may not be considered in determining whether the parties intended to include a promise by CA to adopt a "gold standard" of corporate governance when they entered into the Settlement Agreements at issue herein.

In addition, the Settlement Agreements entered into by the parties were the result of arms-length negotiation between sophisticated businessmen, all of whom were represented by able and established law firms. Had plaintiffs intended for the adoption of a "gold standard" of corporate governance by CA to be a material obligation of the Settlement Agreements, they easily could have negotiated for it and inserted it into the Agreement. They did not do so. Since no such provision appears in either of the Settlement Agreements, the Court concludes that such a promise by CA was not intended by the parties to be included in the Agreements. "An obligation undertaken by one of the parties that is intended as a promise or agreement should be expressed as such and not left to implication." Schmidt, 468 N.Y.S.2d at 654 (citation omitted).

Plaintiffs attempt to circumvent the rule barring consideration of extrinsic evidence where a contract is unambiguous on its face by arguing that the joint press release issued on July 24, 2002 is actually part of the Settlement Agreements. According to plaintiffs, because paragraph five of the Ranger Agreement states that the parties "agree to issue a joint press release in the form attached as Exhibit A" and "to make all statements relating to the matters set forth in this Agreement in a manner that is not inconsistent in any significant manner with the statements in the joint press release," (Giuffra Decl., Ex. N ¶ 5.), the July 24, 2002 press release is actually part of the Settlement Agreements themselves. As such, plaintiffs argue, Wyly's statement in the press release concerning CA's "being recognized as the gold standard in good corporate governance," (Giuffra Decl., Ex. O), is to be considered a contractual term of the Settlement Agreements under which CA was obligated to adopt such a standard of corporate governance.

Plaintiffs' argument is without merit. Although the Court was unable to find any case

law directly on point in New York, the recent case cited by defendants from the Western District of Washington rejects the very assertion made by plaintiffs herein.  In FMC Technologies, Inc. v. Edwards, No. C05-946C, 2007 U.S. Dist. LEXIS 42512, at *1 (W.D. Wash. June 12, 2007), aff'd, 302 Fed. Appx. 577 (9th Cir. 2008), the settlement agreement entered into by the parties specified that the parties would issue a joint press release "as set forth in Exhibit D."  Id. at *25. Plaintiffs thereafter attempted to sue defendants for breach of contract based on defendants' purported "failure to cooperate," relying on a statement in the joint press release that defendants "agreed to cooperate" with plaintiffs "in the future."  Id. at *25.  The Court in FMC initially dismissed plaintiffs' claim without prejudice "because it relied on the text of the parties' joint press release, not a contractual term."  Id.  However, the court granted plaintiffs leave to amend their complaint to state a valid claim for breach of the settlement agreement based on a failure to cooperate, provided that "such a claim could not rely on text that was not made one of the contract terms . . . ."  Id.

　　　Plaintiffs there amended their complaint and defendants thereafter moved for summary judgment.  In granting defendants summary judgment on plaintiffs' "failure to cooperate" claim, the court held that the claim "fail[ed] for lack of a textual basis in the contract."  Id. at *26. According to the court in FMC, although the settlement agreement required the parties to issue a press release containing certain language, it "did not contain a contractual term that the parties 'cooperate.'"  Id.  Accordingly, the court was not permitted to "add a term to the parties' contract based on the extrinsic evidence of the press release text."  Id. (emphasis omitted).  As a result, plaintiffs' "failure to cooperate" claim failed because the provision of the settlement agreement requiring the issuance of a press release "contain[ed] no obligation to 'cooperate.'"  Id.

The same result is required here. Paragraph five of the Ranger Agreement simply required the parties to issue a joint press release and not to make any public statements that differed from that of the press release. (Giuffra Decl., Ex. O.) Nowhere in paragraph five does the contractual term "gold standard" appear. Nor is there any language in paragraph five that could reasonably be construed as creating an obligation on CA's part to adopt a "gold standard" of corporate governance. There is no dispute that CA has complied with paragraph five of the Ranger Agreement. Accordingly, because no such "gold standard" language appears in paragraph five itself, the Court may not add such an obligation to the Agreement by relying on a statement made in the joint press release.

Lastly, assuming arguendo that the Court should consider the joint press release in construing the terms of the Settlement Agreements, it is clear here that it contains no agreement as to the adoption of a "gold standard" of corporate governance by CA. Rather, that statement is a unilateral statement by one party to the Agreements and thus cannot be construed as creating a joint obligation. To the contrary, it tends to confirm that the adoption of a "gold standard" is not part of the Agreements that the parties entered into.

For the foregoing reasons, I recommend that defendants be granted summary judgment with respect to plaintiffs' breach of contract claim.


III.    Fraudulent Inducement

To succeed on a claim of fraudulent inducement under New York law, a plaintiff must establish the following: "(1)          the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the

representation, and (4) the plaintiff suffered damage as a result of such reliance." Wall v. CSX Transp., Inc., 471 F.3d 410, 415-16 (2d Cir. 2006) (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996)) (additional citations omitted).

A.     Breach of Contract Claims May Not be Converted into Fraud Claims

It is well-settled under New York law that "a cause of action sounding in fraud is not viable when the only fraud charged relates to a breach of contract." Miramax Film Corp. v. Abraham, No. 01 Civ. 5202, 2003 U.S. Dist. LEXIS 21346, at *32 (S.D.N.Y. Nov. 24, 2003) (citing Trusthouse Forte (Garden City) Mgmt., Inc. v. Garden City Hotel Inc., 483 N.Y.S.2d 216, 218 (1st Dep't 1984)); see also Locascio v. Aquavella, 586 N.Y.S.2d 78, 79 (4th Dep't 1992) ("Because the only fraud alleged arises out of the same facts that serve as the basis for his causes of action for breach of contract, plaintiff's amended complaint fails to state a legally sufficient cause of action for fraud."); Mastropieri v. Solmar Constr. Corp., 553 N.Y.S.2d 187, 189 (2d Dep't 1990) ("It is well settled that a cause of action to recover damages for fraud will not arise when the only fraud charged relates to a breach of contract."). Rather, where a party is "in essence seeking the enforcement of a contractual bargain, the claim is to be premised upon a breach of contract theory rather than a tort claim." Miramax Film Corp., 2003 U.S. Dist. LEXIS 21346, at *32 (citing cases).

In addition, a plaintiff "cannot convert a breach of contract claim into a fraud claim merely by adding 'an allegation that defendant never intended to uphold [its] end of the deal." Irwin Sales, Inc. v. Prodigy Servs. Corp., No. 99 Civ. 10878, 2000 U.S. Dist. LEXIS 9782, at *3 (S.D.N.Y. July 14, 2000) (quoting Sudul v. Computer Outsourcing Servs., Inc., 868 F. Supp. 56, 62 (S.D.N.Y. 1994)) (alteration in original). Where plaintiff's fraud claim is based on the same

set of facts as his breach of contract claim, "with the addition only of an allegation that defendant never intended to perform the promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Sudul, 868 F. Supp. at 62 (citing cases); see also Wall, 471 F.3d at 416 (noting that "general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim") (alteration in original).

The Amended Complaint herein alleges that CA, and specifically Kumar and former director Richard Grasso ("Grasso"), on behalf of CA, made certain false representations in order to induce plaintiffs to terminate their proxy contest in 2002. (Am. Compl. ¶¶ 55-63.) Specifically, plaintiffs allege that CA and Kumar made the following misrepresentations: (1) that CA would become a "gold standard" in corporate governance; (2) that CA's Board of Directors was already independent and that CA would appoint another independent director before the end of 2002; and (3) that there was nothing improper about CA's accounting practices. (Id. ¶ 57.) These are the same general facts on which plaintiffs base their breach of contract claim. The only difference is that while plaintiffs argue that CA breached the Settlement Agreements by not following through on the foregoing representations, their fraud claim alleges that Kumar and Grasso made the representations "with the intention not to fulfill them." (Id. ¶ 58.) This is precisely the type of repackaged fraud claim that is disallowed under New York law.

"However, not every fraud claim is foreclosed in an action also involving a contract." Wall, 471 F.3d at 416. Even where the parties have a contractual relationship, a claim for fraud may be maintained where plaintiff can "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate [reliance on a] fraudulent misrepresentation

collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." <u>Miramax Film Corp.</u>, 2003 U.S. Dist. LEXIS 21346, at *32-33 (<u>quoting</u> <u>Bridgestone/Firestone</u>, 98 F.3d at 20).

Neither the first or the third elements apply in the within action. The parties here did not owe one another a legal duty separate and apart from their contractual responsibilities. "An arms-length business relationship does not give rise to a fiduciary obligation." <u>Miramax Film Corp.</u>, 2003 U.S. Dist. LEXIS 21346, at *33 (<u>quoting</u> <u>WIT Holding Corp. v. Klein</u>, 724 N.Y.S.2d 55, 68 (2d Dep't 2001)) (additional citation omitted). Nor are plaintiffs seeking any special damages that are not recoverable under a breach of contract theory. Accordingly, the only way that the fraud claim can survive is if plaintiffs can sufficiently establish misrepresentations extraneous and collateral to the Settlement Agreements upon which they relied in entering into the Settlement Agreements. Parol evidence is admissible under New York law to prove a claim of fraudulent inducement. <u>See</u> <u>Wall</u>, 471 F.3d at 416 ("New York also permits the use of parol evidence to prove a claim of fraud in the inducement . . . ."); <u>O'Hearn v. Bodyonics, Ltd.</u>, 22 F. Supp. 2d 7, 13 (E.D.N.Y. 1998) (noting that parol evidence is admissible to prove fraud); <u>Chace v. Bankers Trust Co.</u>, No. 89 Civ. 4497, 1990 U.S. Dist. LEXIS 17353, at *8 (S.D.N.Y. Dec. 18, 1990) ("It is well-settled that the parol evidence rule does not operate in the context of fraud.").

B.      <u>Plaintiffs' Reliance Was Not Reasonable</u>

In assessing the "reasonableness of a plaintiff's alleged reliance," New York courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between

them."[4] Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir.

2003) (citing Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541-43 (2d Cir.

1997)).  Where plaintiffs are "sophisticated parties," such as plaintiffs and defendants herein, and

the statement or omission upon which they base their fraudulent inducement claim "relates to a

business transaction that has been formalized in a contract, New York courts are generally

reluctant to find reliance on oral communications to be reasonable."  Wurtsbaugh v. Banc of

America Secs. LLC, No. 05 Civ. 6220, 2006 WL 1683416, at *6 (S.D.N.Y. June 20. 2006)

(citing Emergent Capital, 343 F.3d at 196) (additional citation omitted); see also Lazard Freres,

108 F.3d at 1541 ("[W]here sophisticated businessmen engaged in major transactions enjoy

access to critical information but fail to take advantage of that access, New York courts are

particularly disinclined to entertain claims of justifiable reliance.").  In addition, "when the party

to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is

required," Global Minerals, 824 N.Y.S.2d at 216 (citing Banque Franco-Hellenique de

Commerce Int'l et Mar, S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997)), and the party

"cannot reasonably rely on such representations without making additional inquiry to determine

their accuracy."  Global Minerals, 824 N.Y.S.2d at 216 (citing Keywell Corp. v. Weinstein, 33

F.3d 159, 164 (2d Cir. 1994)).

---

[4]  While "[q]uestions of the reasonableness of reliance raise issues of fact" that typically
must be determined at trial, MTV Networks v. Curry, 867 F. Supp. 202, 207 (S.D.N.Y. 1994)
(citation omitted), there are certain instances in which "the facts in the case may present a rare
circumstance in which the issue of reasonable reliance can be resolved at the stage of summary
judgment."  Global Minerals and Metals Corp. v. Holme, 824 N.Y.S.2d 210, 215 (1st Dep't 2006)
(stating that it was "set[ting] aside the contention that issues of material misrepresentation and
reasonable reliance are not subject to summary disposition").  This case presents one such
instance.

As stated <u>supra</u>, plaintiffs allege that CA and its representatives made certain oral representations, which CA knew to be false, for the purpose of inducing plaintiffs to enter into the Settlement Agreements. According to plaintiffs, in July 2002, Wyly met with Kumar and Grasso several times in an effort to resolve Ranger's proxy contest. (First Wyly Decl. ¶ 14.) Plaintiffs allege that during these meetings, Kumar and Grasso represented that: (1) CA would upgrade its corporate governance to a "gold standard"; (2) CA's Board of Directors was already independent and that an additional independent director would be elected prior to the end of 2002; and (3) that there was nothing fraudulent about CA's accounting practices. (<u>Id.</u> ¶¶ 14-15; Wyly Decl., dated Nov. 19, 2008 ("Second Wyly Decl."), ¶¶ 23-28, annexed to McGrath Decl. as Ex. 35; Wyly Dep. 142-43, 152-53, 165-67, 201-02.) Plaintiffs further allege that in reliance on these allegedly false representations, plaintiffs entered into the Settlement Agreements and terminated their proxy contest. (First Wyly Decl. ¶ 17.)

However, the evidence submitted in connection with the within motion demonstrates that Wyly had concerns about the credibility of both Kumar and CA's management prior to entering into the Settlement Agreements. For example, Wyly testified at his deposition that as early as 2001, he and his family had "lost confidence" in Kumar and Charles Wang ("Wang") and their "being the best people to run [CA]." (Wyly Dep. 36.) Wyly further testified that as of June 27, 2001, he believed that CA's credibility had been damaged due to an "accounting controversy." (Wyly Dep. 80-81, 85.) According to Wyly, as of 2001, he "clearly thought . . . that something [was] rotten in Denmark in terms of [CA's] board and its management." (Wyly Dep. 83-84.) Moreover, Wyly testified that at the time Ranger lost its first proxy contest in 2001, he "distrust[ed]" Wang, Kumar and CA, felt that CA's culture was "corrupt," and believed that

Kumar "lack[ed] integrity." (Wyly Dep. 98, 109-10.) Finally, in a declaration dated July 20, 2005, Wyly stated that by mid-2002, he was "deeply concerned" about Kumar and Wang's management of CA and "the disclosures being made to CA shareholders." (First Wyly Decl. ¶ 11.) "Where circumstances are 'so suspicious as to suggest to a reasonably prudent plaintiff that the defendant's representations may be false, and that the plaintiff cannot reasonably rely on those representations,' a plaintiff must 'make additional inquiry to determine their accuracy." Duval v. Rebane, No. 99 CV 3612, 2001 U.S. Dist. LEXIS 2788, at *4 (E.D.N.Y. Mar. 14, 2001) (quoting Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997)).

Wyly is a sophisticated businessmen who was paid ten million dollars under the Settlement Agreements herein. By his own testimony, Wyly distrusted Kumar, was concerned about the disclosures being made to CA's shareholders and was aware of certain suspicious accounting activities being employed by CA as early as 2001. Such knowledge and belief was "more than sufficient to put a reasonably prudent plaintiff on notice that defendants' representations could not be reasonably relied upon without further inquiry." Duval, 2001 U.S. Dist. LEXIS 2788, at *5. Yet plaintiffs undertook no such inquiry and instead now ask the Court to believe that they naively relied on Kumar and Grasso's purported oral representations when entering into the Settlement Agreements at issue herein. "When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that facts may not be as represented." Global Minerals, 824 N.Y.S.2d at 216 (citing Rodas v. Manitaras, 552 N.Y.S.2d 618, 620 (1st Dep't 1990)); see also Duval, 2001 U.S. Dist. LEXIS 2788, at *5 (finding that where plaintiff was aware of defendants' past criminal behavior, his reliance on defendants' representations was "at his own peril and [he] now

cannot claim fraud"). "Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." Lazard Freres, 108 F.3d at 1543.

Based on the foregoing, plaintiffs herein "can hardly claim with any credibility that [Wyly], a savvy businessman, entered into the [Settlement Agreements] lulled by faith or trust in the parties across the bargaining table . . . ." Shea v. Hambros PLC, 673 N.Y.S.2d 369, 374 (1st Dep't 1998) (citation omitted). Plaintiffs' alleged reliance on defendants' oral representations was not reasonable under the circumstances set forth above. Accordingly, plaintiffs' fraudulent inducement claim fails as a matter of law and summary judgment should be granted to defendants.


IV.    Plaintiffs' Claims for Declaratory Relief

Plaintiffs go to great lengths in their opposition papers to assert that triable issues of fact exists with respect to their claims for declaratory relief, which necessitate a trial in this action. Specifically, plaintiffs argue that CA has not sought summary judgment with respect to the following two declarations that plaintiffs seek: (1) a declaration that "Plaintiffs' actions with respect to Ranger's derivative suit and the conduct alleged therein does not violate the terms of the [Settlement] Agreements; and, (2) a declaration that "pursuing, or requesting pursuit, of derivative claims on behalf of CA does not violate the [Settlement Agreements]." (Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J. 12; Am. Compl. ¶ 66.) However, CA states in its reply papers that it is not claiming that Ranger's pursuit of the Derivative Action violates the Settlement Agreements. (Def. Reply Mem. of Law in Supp. of Mot. for Summ. J. 8-9.)

As a threshold matter, "declaratory relief is not a claim but only a remedy that Congress has created so that the court 'may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought.'" In re Methyl Tertiary Butyl Ether Prods. Liability Litig. ("In re MTBE"), 247 F.R.D. 420, 422 (S.D.N.Y. 2007) (quoting 28 U.S.C. § 2201; see also In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) ("The Declaratory Judgment Act does not expand jurisdiction . . . Nor does it provide an independent cause of action."); Bristol-Meyers Squibb Co. v. SR Int'l Bus. Ins. Co., 354 F. Supp. 2d 499, 506 (S.D.N.Y. 2005) (describing a declaratory judgment as a "remedy"); Travelers Property Cas. Corp. v. Winterthur Int'l, No.02 Civ. 2406, 2002 U.S. Dist. LEXIS 11342, at *15 (S.D.N.Y. June 25, 2002) ("A declaratory judgment is a remedy. It's availability does not create an additional cause of action . . . ."). Indeed, the very statute that provides for the issuance of declaratory judgments is entitled "Creation of remedy." 28 U.S.C. § 2201. "The claim, or the 'legal theory under which relief is sought,' must be based on other laws that the defendant allegedly violated in order to receive [declaratory] relief." In re MTBE, 247 F.R.D. at 422 (quoting In re MTBE, 2007 WL 2781946, at *1 (S.D.N.Y. Sept. 20, 2007)); see also In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d at 731 (stating that "a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief").

Here, plaintiffs' Amended Complaint contains an independent cause of action entitled "Declaratory Relief." (Am. Compl. ¶¶ 64-67.) Based on the foregoing case law, however, this is procedurally improper as a declaratory judgment is not a cause of action but instead a form of relief.

Moreover, declaratory relief is only permitted in "in cases presenting 'actual

controversies . . . .'"  Niagra Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1997) (quoting 28 U.S.C. § 2201(a)).  The purpose of this requirement is to protect against the issuance of advisory opinions.  See United Pub. Workers v. Mitchell, 330 U.S. 75, 89 (1947) ("As is well known, the federal courts established pursuant to Article III of the Constitution do not render advisory opinions . . . This is as true of declaratory judgments as any other field."); Olin Corp. v. Consol. Aluminum Corp., 5 F.3d, 10, 17 (2d Cir. 1993) ("We cannot allow the declaratory judgment procedure to be used as a medium for securing an advisory opinion in a controversy which has not arisen.") (internal quotation marks omitted); Penguin Books USA, Inc. v. Walsh, 929 F.2d 69, 72 (2d Cir. 1991) ("A federal court lacks the power to render advisory opinions and the authority to decide questions that cannot affect the rights of litigants in the case before them.") (internal quotation marks omitted).  Accordingly, in order to be entitled to declaratory relief, "there must be 'a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'"  Niagra Mohawk Power Corp., 94 F.3d at 752 (quoting Olin Corp., 5 F.3d at 17 (emphasis in original) (additional citation omitted).  The decision to issue a declaratory judgment is committed to the sound discretion of the district court.  See Bristol-Meyers Squibb, 354 F. Supp. 2d at 506 (citing Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995)).

Here, defendants assert that they do not claim that plaintiffs' initiation of the Derivative Action violates the Settlement Agreements between the parties.  As defendants point out, they are not counterclaiming herein for breach of the Settlement Agreements, (see Def. 2d Am. Ans.), which would be the obvious course of action if defendants were making any such claim.

-28-

Moreover, to the extent that plaintiffs seek declaratory relief in futuro, it is clearly moot since the Settlement Agreements expired after five (5) years - in 2007. Accordingly, there does not appear to be a "live controversy" between the parties with respect to plaintiffs' claims for declaratory relief. Niagra Mohawk Power Corp., 94 F.3d at 752.

"District courts have the discretion to grant summary judgment sua sponte, even without notice in certain circumstances." Island Park, LLC v. CSX Transp., 559 F.3d 96, 101 (2d Cir. 2009) (quoting Schwan-Stabilo Cosmetics GmbH & Co. v. PacificLink Int'l Corp., 401 F.3d 28, 33 (2d Cir. 2005)). However, "care should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." Schwan-Stabilo, 401 F.3d at 33. Here, plaintiffs devoted a large portion of their opposition papers to their argument that genuine issues of fact exist with respect to their request for declaratory relief and as such, have had a full and fair opportunity to present this issue. However, the law is clear that declaratory relief may only be granted in actions involving an actual controversy, which, as discussed above, is lacking in the within action. Accordingly, the necessary prerequisites for granting summary judgment sua sponte have been met here.

Based on the foregoing, Count Two of plaintiffs' Amended Complaint should be dismissed since a request for declaratory relief is not an independent cause of action. Moreover, since there does not appear to be an actual case or controversy with respect to plaintiffs' request for declaratory relief, any such relief is otherwise without merit.

V.    Atttorney's Fees

Finally, plaintiffs seek to be reimbursed for their attorney's fees and expenses incurred in connection with the within action.  As a threshold matter, only the 1999 Agreement between Sterling and Wyly - which CA became obligated under by the 2000 Amendment - contains any language with respect to attorney's fees.  (Giuffra Decl., Ex. B.)  The Ranger Agreement is silent on the issue of attorney's fees.  Accordingly, Ranger is not entitled to reimbursement of its attorney's fees and expenses.

With respect to Wyly's claim for reimbursement, the 1999 Agreement and the 2000 Amendment provide for such reimbursement under the following circumstances: (1) if it "should appear" to Wyly that CA has "failed to comply with any of its obligations" under the Agreement; (2) if CA "takes or threatens to take any action to declare [the] Agreement void or unenforceable"; or (3) if CA "institutes any litigation or other action or proceeding designed to deny, or to recover from, [Wyly] the benefits provided" under the Agreement.  (Giuffra Decl., Ex. B ¶ 7.)  Wyly asserts that he is entitled to reimbursement of his attorney's fees because he was forced to commence the instant litigation in response to a letter he received from CA in 2004 threatening him with legal action for his purported breach of the Settlement Agreements.

The letter on which Wyly bases his claim is dated June 30, 2004 and was written by CA's counsel in response to a June 7, 2004 letter it received from plaintiffs' counsel.  (McGrath Decl., Ex. 3.)  In the letter, CA's counsel states that it views plaintiffs' June 7, 2004 letter as a breach of both Ranger's and Wyly's obligations under the Settlement Agreements and that it "expects [plaintiffs] to honor their contractual obligations."  (Id.)  Nothing contained in the June 30, 2004 letter could have caused Wyly to believe that CA had "failed to comply with any of its

obligations" under the 1999 Agreement.  As stated <u>supra</u>, CA has complied with all of its contractual obligations with respect to plaintiffs.  In fact, as the letter clearly states, CA was attempting to ensure that Wyly and Ranger were indeed honoring their contractual obligations as well.  Accordingly, Wyly is not entitled to attorney's fees under the first ground of the 1999 Agreement.

The second ground under which Wyly is entitled to attorney's fees is if CA "takes or threatens to take any action to declare [the] Agreement void or unenforceable."  However, there is nothing contained in the June 30, 2004 letter that would constitute a declaration or a threat on CA's part to declare the 1999 Agreement - or any of the agreements between the parties for that matter - void or unenforceable.  As stated above, CA was expressly seeking to hold Wyly to his contractual obligations and ensure that he did not breach their agreements.  Accordingly, Wyly's claim for attorney's fees fails on this ground as well.

Finally, with respect to the third ground - if CA "institutes any litigation or other action or proceeding designed to deny, or to recover from, [Wyly] the benefits provided" under the 1999 Agreement - this claim also fails.  CA is not the one who instituted the within action.  Moreover, as Wyly apparently seems to overlook, nothing contained in CA's papers seeks the return of the $10 million that CA paid to Wyly under the Settlement Agreements.  Rather, it is Wyly who commenced this action against CA.[5]  Accordingly, Wyly is not entitled to attorney's

_____

[5]  This is not the first or only such action commenced by Wyly and/or Ranger Governance against CA.  As stated <u>supra</u>, Ranger Governance commenced the Derivative Action against CA in 2004, <u>Computer Associates Int'l, Inc. Derivative Litig.</u>, CV 04-2697.  In addition, Wyly and/or Ranger Governance attempted to set aside a settlement reached in three other derivative and class actions brought against CA, pursuant to Federal Rule of Civil Procedure 60(b).  <u>See</u> <u>Federman v. Artzt</u>, CV 03-4199; <u>In re Computer Associates 2002 Class Action Secs. Litig.</u>, CV 02-1226; <u>Barroway v. Computer Associates Int'l, Inc.</u>, CV 98-4839.  On August 1,

-31-

fees under this ground either.

Based on the foregoing, and according to the terms contained in the 1999 Agreement, Wyly's claim for the reimbursement of his attorney's fees and expenses incurred in connection with the within action fails as a matter of law. Accordingly, summary judgment should be granted to defendants on this claim as well.

## RECOMMENDATION

For the foregoing reasons, I recommend that defendants' motion for summary judgment be granted and that judgment be entered in favor of the defendants, dismissing this action in its entirety.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of receipt of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), and 72(b); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822 (1994); Frank v. Johnson, 968 F.2d 298 (2d Cir. 1992), cert. denied, 506 U.S. 1038 (1992); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

---

2007, Judge Platt denied the 60(b) motions in those cases and the Circuit recently affirmed Judge Platt's decisions, finding that Wyly and Ranger Governance lacked standing to bring the 60(b) motions because they were not parties to the those actions. See Federman v. Artzt, 2009 WL 2223492, at *2 (2d Cir. July 23, 2009).

**SO ORDERED:**

Dated: Central Islip, New York
      September 2, 2009

                                        /s/ E. Thomas Boyle
                                        HON. E. THOMAS BOYLE
                                        United States Magistrate Judge